John T. Jasnoch (Bar No. 281605)
Hal D. Cunningham (Bar. No. 243048)
**SCOTT+SCOTT**
**ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 233-4565
Facsimile: (619) 233-0508
jjasnoch@scott-scott.com
hcunningham@scott-scott.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| G.R., a Minor, by and through Her Guardian Mayra De La Cruz, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>TIKTOK, INC., a California Corporation, and BYTEDANCE, INC., a Delaware Corporation,<br><br>Defendant. | Case No. 2:23-cv-00509<br><br>**CLASS ACTION COMPLAINT**<br><br><u>JURY TRIAL DEMANDED</u> |

## COMPLAINT - CLASS ACTION

Plaintiff G.R., a minor, by and through her guardian Mayra De La Cruz ("Plaintiff"), individually and on behalf of all others similarly situated, hereby files this class action complaint against TikTok, Inc. f/k/a Musical.ly, Inc. ("TikTok, Inc." or "TikTok") and ByteDance, Inc. ("ByteDance") (collectively, "Defendants"), and in support thereof alleges the following:

## INTRODUCTION

1.     This is a class action brought against Defendants for surreptitiously intercepting the private electronic communications of users of TikTok's social media application (the "TikTok app") and its integrated website browser (the "in-app browser") without their consent.   Defendants intercept these private electronic communications in violation of the Federal Wire Tap Act, 18 U.S.C. §§2510, *et seq.* by embedding JavaScript code into the third-party websites that are accessed using TikTok's in-app browser, which enables Defendants to track users' mouse movements, clicks, keystrokes (*e.g.*, text being entered into an information field or text box), URLs of web pages visited, and other electronic communications in real time (collectively, "Website Communications").

2.     Plaintiff brings this action individually and on behalf of a class of all natural persons in the United States whose Website Communications were intercepted by Defendants while using the TikTok in-app browser to visit third-party websites, and seeks all civil remedies provided under the Federal Wire Tap Act, including, but not limited to, appropriate equitable and/or declaratory relief, damages in an amount to be determined at trial (assessed as the greater of (a) the sum of actual damages suffered by Plaintiff and the proposed Class and any profits made by Defendants as a result of the violation, or (b) statutory damages of $100 per day per violation or $10,000, whichever is greater), and reasonable attorneys' fees and costs.

## PARTIES

3.     Plaintiff G.R. is a minor and brings this suit by and through her legal guardian Mayra De La Cruz.  Plaintiff G.R. is a natural person, a citizen of the State of California, and a resident of Los Angeles County.  During the Class Period, Plaintiff used the TikTok in-app browser to visit third-party websites where her Website Communications were intercepted by Defendants.

4.     Defendant ByteDance, Inc. is, and at all relevant times was, a Delaware corporation with its principal place of business in Mountain View, California. Defendant ByteDance, Inc. is a wholly owned subsidiary of ByteDance, Ltd., a Cayman Islands corporation.

5.     Defendant TikTok, Inc. f/k/a Musical.ly, Inc. is, and at all relevant times was, a California corporation with its principal place of business in Culver City, California.[1] Defendant TikTok, Inc. also maintains offices in Palo Alto, California and Mountain View, California.[2]  The name change from Musical.ly, Inc. to TikTok, Inc. occurred in May 2019.  Defendant TikTok, Inc. is a wholly owned subsidiary of TikTok, LLC, which in turn is a wholly owned subsidiary of TikTok, Ltd.   And TikTok, Ltd. – like Defendant ByteDance, Inc. – is a wholly owned subsidiary of ByteDance, Ltd.

## JURISDICTION AND VENUE

6.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §1331 because this suit is brought under the laws of the United States, namely the Federal Wire Tap Act, 18 U.S.C. §§2510, *et seq.*

---

[1]     Salvador Rodriguez, *TikTok has moved into Facebook's backyard and is starting to poach its employees*, CNBC (Oct. 14, 2019), https://www.cnbc.com/2019/10/14/tiktok-has-mountain-view-office-near-facebook-poaching-employees.html.

[2]     Drew Harwell & Tony Room, *Inside TikTok: A culture clash where U.S. views about censorship often were overridden by Chinese bosses*, WASH. POST (Nov. 5, 2019), https://www.washingtonpost.com/technology/2019/11/05/inside-tiktok-culture-clash-where-us-views-about-censorship-often-were-overridden-by-chinese-bosses/; *see supra*, n.1.

2

7.      This Court has general personal jurisdiction over Defendants because their principal places of business are in California.   Additionally, Defendants are subject to specific personal jurisdiction in this State because a substantial part of the events and conduct giving rise to Plaintiff's and the Class's claims occurred in this State.   The privacy violations complained of herein resulted from Defendants' purposeful and tortious acts directed from California.  At all relevant times, Defendants knew that their practices would directly result in collection of information from California and elsewhere while those citizens used the TikTok in-app browser.

8.      Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because a substantial portion of the conduct described in this complaint was carried out in this District.

## FACTUAL ALLEGATIONS

### A.      TikTok Becomes a Global Phenomenon with a Strong Presence in the United States

9.      Musical.ly, now known as TikTok, is a highly popular social media and social networking app that was first launched in 2014.  The Musical.ly app allows users to create short videos of themselves and share them with friends.[3]

10.      The Musical.ly app provides tools that users can utilize to create and edit their videos.  It also provides a large library of music from which users may select background music for their videos.

11.      Beyond creating and sharing of videos, the Musical.ly app provides a platform through which users can interact by, among other things, commenting on other users' videos and "following" their accounts.   Users also can send direct messages to communicate with one another on the app.

---

[3]      Liza Lin & Rolfe Winkler, *Social-Media App Musical.ly Is Acquired for as Much as $1 Billion*, WALL ST. J. (Nov. 9, 2017), https://www.wsj.com/articles/lip-syncing-app-musical-ly-is-acquired-for-as-much-as-1-billion-1510278123.

CLASS ACTION COMPLAINT – No. 2:23-cv-00509

12.     By November 2017, the Musical.ly app had 60 million monthly active users.[4]

13.     At approximately the same time, another entity, Beijing ByteDance, launched its own app in China called "Douyin," which roughly mirrored the Musical.ly app.[5]   By 2017, shortly before its purchase of Musical.ly, Beijing ByteDance introduced an English-language version of the Douyin app under the name "TikTok" for use outside of the China market.

14.     After acquiring Musical.ly, Beijing ByteDance combined the Musical.ly app with its TikTok app in 2018, merging all existing accounts and data into a single app under the retained "TikTok" name.[6]   Therefore, Musical.ly and TikTok apps are collectively referred to herein as the "TikTok app," and Musical.ly and TikTok users are collectively referred to as "TikTok users."

15.     The TikTok app has become "one of the world's fastest-growing social media platforms" and a "global phenomenon."[7]

16.     According to the *Washington Post*, by November 2019 the TikTok app had been downloaded more than 1.3 billion times worldwide, and more than 120 million times in the United States.[8]   By April 2020, *TechCrunch* reported that the

---

[4]     *See supra*, n.3; Jack Nicas, Mike Isaac & Ana Swanson, *TikTok Said to Be Under National Security Review*, N.Y. TIMES (Nov. 1, 2019), https://www.nytimes.com/2019/11/01/technology/tiktok-national-security-review.html.

[5]     Georgia Wells, Yang Jie & Yoko Kubota, *TikTok's Videos Are Goofy. Its Strategy to Dominate Social Media Is Serious*, WALL ST. J. (June 29, 2019), https://www.wsj.com/articles/tiktoks-videos-are-goofy-its-strategy-to-dominate-social-media-is-serious-11561780861.

[6]     Helen Ehrlich, *TikTok is Scamming People & Stealing Information*, AFFINITY (Nov. 4, 2018), http://culture.affinitymagazine.us/tik-tok-is-scamming-people-stealing-information/.

[7]     Drew Harwell & Tony Room, *Inside TikTok: A culture clash where U.S. views about censorship often were overridden by Chinese bosses*, WASH. POST (Nov. 5, 2019), https://www.washingtonpost.com/technology/2019/11/05/inside-tiktok-culture-clash-where-us-views-about-censorship-often-were-overridden-by-chinese-bosses/.

[8]     *Id.*

number of worldwide TikTok app downloads had surpassed two billion, and that in "the quarter that ended on March 31, TikTok was downloaded 315 million times – the highest number of downloads for any app in a quarter."[9] By many accounts, the TikTok app is the most downloaded non-game app in the world.[10]

17. As of the third quarter of 2022, TikTok had 1.5 billion monthly active users.[11] The average user opened the TikTok app more than eight times per day and spent approximately 45 minutes on the app daily as of March 2019.[12]

18. TikTok's massive global presence has also reached the United States. As of August 2020, TikTok admitted to having more than 100 million monthly active users in the United States.[13] Some estimates indicate there are 123.8 million active users of TikTok in the United States.[14] In other words, over one-third of the United States's 328.2 million population has used TikTok, and approximately 50 million Americans use TikTok every day.[15]

---

[9] Manish Singh, *TikTok tops 2 billion downloads*, TECHCRUNCH (Apr. 29, 2020), https://techcrunch.com/2020/04/29/tiktok-tops-2-billion-downloads/.

[10] Grace Shao, *China's globally popular camera apps may open up user data to Beijing requests*, CNBC (July 24. 2019), https://www.cnbc.com/2019/07/25/china-camera-apps-may-open-up-user-data-to-beijing-government-requests.html.

[11] Daniel Ruby, *36 TikTok Statistics 2023: How Many Users Are There!*, DEMANDSAGE (Jan. 20, 2023), https://www.demandsage.com/tiktok-user-statistics/.

[12] *See supra*, n.5.

[13] Complaint for Injunctive and Declaratory Relief, ¶19, *TikTok Inc., et al. v. Trump, et al.*, No. 2:20-cv-7672 (C.D. Cal. Aug. 24, 2020), ECF No. 1, available at: https://cdn.vox-cdn.com/uploads/chorus_asset/file/21812645/document__1_.pdf (hereafter "*TikTok v. Trump*").

[14] *See In re Complaint & Request for Investigation of TikTok for Violations of the Children's Online Privacy Protection Act and Implementing Rule*, FTC (May 14, 2020), https://commercialfreechildhood.org/wp-content/uploads/2020/05/tik_tok_complaint.pdf.

[15] *TikTok v. Trump*, ¶21.

## B.    TikTok Profits from Monetizing Users' Personal Data

19.    The "world's most valuable resource is no longer oil, but data."[16]   In today's world, the ability to obtain and utilize customer data to shape products, solutions, and the buying experience is critically important to a business's success. Research shows that businesses who "leverage customer behavior insights outperform peers by 85 percent in sales growth and more than 25 percent in gross margin."[17]

20.    Unsurprisingly, consumers' personal data has inherent, measurable value.   The Organization for Economic Cooperation and Development ("OECD") previously estimated the prices for various elements of personal data, including $0.50 USD for an address, $2.00 USD for a date of birth, $8.00 USD for a social security number, $3.00 USD for a driver's license number, and $35.00 USD for a military record.[18]

21.    TikTok's financial success is due in large part to its ability to obtain and utilize consumers' personal financial information to create targeted advertising that it runs through the TikTok app.   Thus, this targeted advertising relies upon TikTok's knowledge of each of its user's personal preferences.[19]

22.    Using highly invasive and secretive practices, Defendants have unlawfully collected private personal information about TikTok's users that Defendants then monetize through advertising.

[16]    *The world's most valuable resource is no longer oil, but data*, THE ECONOMIST (May 6, 2017), https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longer-oil-but-data.

[17]    Brad Brown, Kumar Kanagasabai, Prashant Pant & Goncalo Serpa Pinto, *Capturing value from your customer data*, MCKINSEY (Mar. 15, 2017), https://www.mckinsey.com/business-functions/quantumblack/our-insights/capturing-value-from-your-customer-data (footnote omitted).

[18]    *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD DIGITAL ECONOMY PAPERS, No. 220 (Apr. 2, 2013), https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf.

[19]    Shubham Agarwal, *Get ready for targeted ads based on your TikTok watch history*, DIGITALTRENDS (Aug. 27, 2019), https://www.digitaltrends.com/social-media/tiktok-advertiser-audience-network-targeted-ads/.

CLASS ACTION COMPLAINT – No. 2:23-cv-00509

23.     As a result of these practices, TikTok was able to generate an estimated $4.6 billion in revenue in 2021, a 142% increase year-over-year.[20]

## C.    Prior Privacy Concerns Regarding Musical.ly/TikTok's Data Use Practices

### 1.    The 2019 FTC Action

24.     On February 27, 2019, the United States, on behalf of the Federal Trade Commission ("FTC"), filed a lawsuit against Musical.ly alleging it had violated the Children's Online Privacy Protection Act ("COPPA") by collecting and using personal data from children under age 13 without the required notice and consent from parents or guardians.[21]   According to the FTC, Musical.ly's violations were knowing and willful, as it received numerous complaints from concerned parents.  In fact, in a two-week period in September 2016, Musical.ly received more than 300 complaints from angry parents demanding that Musical.ly close their children's accounts.[22]   While Musical.ly closed the accounts, they did not delete the minors' videos or profile information from their servers.[23]

25.     Ultimately, Musical.ly stipulated to an order requiring, among other things, payment of a $5.7 million civil penalty and injunctive relief regarding the collection and destruction of children's personal data.[24]   This fine is the largest civil penalty ever imposed for such a violation.[25]   According to the FTC, "'[i]n our view,

---

[20]     Mansoor Iqbal, *TikTok Revenue and Usage Statistics (2023)*, BUSINESS OF APPS (Jan. 9, 2023), https://www.businessofapps.com/data/tik-tok-statistics/.

[21]     Complaint for Civil Penalties, Permanent Injunction & Other Equitable Relief, *United States v. Musical.ly and Musical.ly, et al.*, No. 2:19-cv-01439-ODW-RAO (C.D. Cal. Feb. 27, 2019), ECF No. 1.

[22]     *Id.*, ¶21.

[23]     *Id.*

[24]     Stipulated Order for Civil Penalties, Permanent Injunction & Other Equitable Relief, *United States v. Musical.ly, et al.*, No. 2:19-cv-01439-ODW-RAO (C.D. Cal. Mar. 27, 2019), ECF No. 10.

[25]     *See supra*, n.5; Yingzhi Yang, *TikTok owner Bytedance gathers 1 billion monthly active users across its apps*, TECH IN ASIA (June 20, 2019), https://www.techinasia.com/tiktok-owner-bytedance-gathers-1-billion-monthly-active-users-apps.

these practices reflected the company's willingness to pursue growth even at the expense of endangering children.'"[26]

26.     Musical.ly's compliance with the FTC stipulation has been called into question.  In 2020, the FTC renewed its interest in Musical.ly and TikTok, going as far as to issue an order requiring TikTok to provide information regarding how it collects and uses its users' personal information, as well as information regarding TikTok's advertising practices.[27]

27.     In 2020, the FTC further issued a joint statement explaining that social media companies like TikTok "have been able to exploit their user-surveillance capabilities to achieve such significant financial gains that they are now among the most profitable companies in the world."  Moreover, social media companies' "constant access" to users' mobile devices allows them "to monitor where users go, the people with whom they interact, and what they are doing."[28]

### 2.     The United States Senate

28.     In October 2019, United States Senators Charles Schumer and Tom Cotton sent a letter to the Acting Director of National Intelligence describing the "national security" risks posed by the TikTok app.  In that letter, the Senators noted there was evidence that Defendants may share private and personally identifiable user data and content with the Chinese government:

---

[26]     Farnoush Amiri, *TikTok to pay $5.7 million over alleged violation of child privacy law*, NBC NEWS (Feb. 27, 2019), https://www.nbcnews.com/tech/tech-news/tiktok-pay-5-7-million-over-alleged-violation-child-privacy-n977186.

[27]     Press Release, FTC, *FTC Issues Orders to Nine Social Media and Video Streaming Services Seeking Data About How They Collect, Use, and Present Information* (Dec. 14, 2020), https://www.ftc.gov/news-events/press-releases/2020/12/ftc-issues-orders-nine-social-media-video-streaming-services.

[28]     *Joint Statement of FTC Commissioners Chopra, Slaughter, and Wilson Regarding Social Media and Video Streaming Service Providers' Privacy Practices*, No. P205402 (Dec. 14, 2020), https://www.ftc.gov/system/files/documents/reports/6b-orders-file-special-reports-social-media-video-streaming-service-providers/joint_statement_of_ftc_commissioners_chopra_slaughter_and_wilson_regarding_social_media_and_video.pdf

CLASS ACTION COMPLAINT – No. 2:23-cv-00509

TikTok's terms of service and privacy policies describe how it collects data from its users and their devices, including user content and communications, IP address, location-related data, device identifiers, cookies, metadata, and other sensitive personal information.  While the company has stated that TikTok does not operate in China and stores U.S. user data in the U.S., ByteDance is still required to adhere to the laws of China.

Security experts have voiced concerns that China's vague patchwork of intelligence, national security, and cybersecurity laws compel Chinese companies to support and cooperate with intelligence work controlled by the Chinese Communist Party.

\*          \*          \*

With over 110 million downloads in the U.S. alone, TikTok is a potential counterintelligence threat we cannot ignore.  Given these concerns, we ask that the Intelligence Community conduct an assessment of the national security risks posed by TikTok . . . and brief Congress on these findings.[29]

29.     Similarly, at a hearing held by the Senate Judiciary Subcommittee on Crime and Terrorism, United States Senator Josh Hawley stated in opening remarks: "'TikTok should answer . . . to the millions of Americans who use their product with no idea of its risks . . . .'"[30]  Chairman Hawley also told reporters that: "'The idea that

---

[29]     Ben Kochman, *Sens. Want TikTok Investigated for National Security Threats*, LAW 360 (Oct. 24, 2019), https://www.law360.com/articles/1213180/sens-want-tiktok-investigated-for-national-security-threats; Press Release, Tom Cotton, U.S. Senator from Arkansas, *Cotton, Schumer Request Assessment of National Security Risks Posed by China-Owned Video-Sharing Platform, Tiktok, A Potential Counterintelligence Threat with Over 110 Million Downloads in U.S., Alone* (Oct. 24, 2019), https://www.cotton.senate.gov/?p=press_release&id=1239.

[30]     Emily Birnbaum, *TikTok faces lawmaker anger over China ties*, THE HILL (Nov. 5. 2019), https://thehill.com/policy/technology/469114-tiktok-faces-lawmaker-anger-over-china-ties.

TikTok is not sharing any data, is not taking direction from Beijing, that just does not appear to be true . . . .”[31]

30.    Later, in May 2020, a bipartisan group of prominent United States Senators wrote to the FTC that, “‘[f]aced with compelling evidence that this wildly popular social media platform is blatantly flouting binding U.S. privacy rules, the FTC should move swiftly to launch an investigation and forcefully hold violators accountable . . . .’”[32]

### 3.    The 2020 Illinois Biometric Information Privacy Act Litigation

31.    In December 2020, TikTok and related companies were sued for their alleged violation of the Illinois Biometric Information Privacy Act (BIPA), a state statute prohibiting private companies from collecting, capturing, purchasing, or otherwise obtaining a person's biometric identifiers or information without proper authorization.  That case settled for $92 million.

### D.    TikTok Collects Users' Website Communications without Their Consent

32.    People generally access websites using their preferred or default internet browsers, such as Google's Chrome or Apple's Safari.  But while using the TikTok app, websites are opened by TikTok's in-app browser instead.  Thus, when a TikTok user clicks on a link while using the TikTok app, the website opens in the TikTok in-app browser rather than the user's preferred or default internet browser for that particular device.

33.    TikTok's in-app browser was specifically designed to insert JavaScript code into any third-party website that users access while using the in-app browser.  The inserted JavaScript code, in turn, intercepts, records, and copies all Website

---

[31] *Id.*

[32] *U.S. senators urge probe of TikTok on children's privacy*, REUTERS (May 29, 2020),    https://www.reuters.com/article/us-tiktok-privacy-usa-children/u-s-senators-urge-probe-of-tiktok-on-childrens-privacy-idUSKBN2352YD.

CLASS ACTION COMPLAINT – No. 2:23-cv-00509

Communications made by the user while interacting with the third-party website accessed using TikTok's in-app browser.[33]  This includes, among other things, every click, keystroke, or mouse movement made by the user while interacting with the third-party website.

34.    For example, in the case of a user who visits a third-party website to make a purchase, the JavaScript code could intercept, record, and copy the user's name, address, telephone number, date of birth, and credit card information, as well as the user's username and password for the third-party website.  In the case of a user's visit to a healthcare provider, the JavaScript code could intercept private and sensitive health-related information about the user's physical and/or mental health.

35.    Neither the TikTok user nor the third-party website which the user visited consents to the insertion of this JavaScript code.

**E.    Website Users Have a Reasonable Expectation of Privacy in Their Interactions with Websites**

36.    Consumers are skeptical and are wary about their data being collected. A report released by KPMG shows that "[a] full 86% of the respondents said they feel a growing concern about data privacy, while 78% expressed fears about the amount of data being collected."[34]

37.    Another recent paper also indicates that most website visitors will assume their detailed interactions with a website will only be used by the website and not be shared with a party they know nothing about.[35]  As such, website visitors

---

[33]    *See* Felix Krause, *iOS Privacy: Instagram and Facebook can track anything you do on any website in their in-app browser*, KRAUSEFX (Aug. 10, 2022), https://krausefx.com/blog/ios-privacy-instagram-and-facebook-can-track-anything-you-do-on-any-website-in-their-in-app-browser.

[34]    Lance Whitney, *Data privacy is a growing concern for more consumers*, TECHREPUBLIC (Aug. 17, 2021), https://www.techrepublic.com/article/data-privacy-is-a-growing-concern-for-more-consumers/.

[35]    *CUJO AI Recent Survey Reveals U.S. Internet Users' Expectations and Concerns Towards Privacy and Online Tracking*, CUJO (May 26, 2020), https://www.prnewswire.com/news-releases/cujo-ai-recent-survey-reveals-us-

reasonably expect that their interactions with a website should not be released to third parties unless explicitly stated.[36]

38.    Privacy polls and studies show that a majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' data.

39.    A recent study by *Consumer Reports* shows that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believe internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[37]

40.    Moreover, according to a study by *Pew Research Center*, a majority of Americans, approximately 79%, are concerned about how data is collected about them by companies.[38]

41.    Users act consistently with their expectation of privacy.  Following a new rollout of the iPhone operating software – which asks users for clear, affirmative consent before allowing companies to track users – 85% of worldwide users and 94% of U.S. users chose not to allow such tracking.[39]

---

internet-users-expectations-and-concerns-towards-privacy-and-online-tracking-301064970.html.

[36]    Frances S. Grodzinsky, Keith W. Miller & Marty J. Wolf, *Session Replay Scripts: A Privacy Analysis*, THE INFORMATION SOCIETY, 38:4, 257, 258 (2022).

[37]    *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, CONSUMER REPORTS (May 11, 2017), https://www.consumerrepor ts.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety/.

[38]    Brooke Auxier, et al., *Americans and Privacy: Concerned, Confused, and Feeling Lack of Control Over Their Personal Information*, PEW RESEARCH CENTER, (Nov. 15, 2019), https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-Confused-and-feeling-lack-of-control-over-their-personal-information/.

[39]    Margaret Taylor, *How Apple screwed Facebook*, WIRED, (May 19, 2021), https://www.wired.co.uk/article/apple-ios14-facebook.

12

CLASS ACTION COMPLAINT – No. 2:23-cv-00509

## CLASS ACTION ALLEGATIONS

42.     Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of the following Class:

*All natural persons in the United States who used TikTok's in-app browser to visit websites external to the app.*

43.     Excluded from the class are Defendants, their parents, subsidiaries, affiliates, officers, and directors, all persons who make a timely election to be excluded from the Class, the judge to whom this case is assigned and any immediate family members thereof, and the attorneys who enter their appearance in this action.

44.     **Numerosity:** The members of the Class are so numerous that individual joinder of all Class members is impracticable.  The precise number of Class members and their identities may be obtained from the books and records of Defendants.

45.     **Commonality:** This action involves questions of law and fact that are common to Class members.  Such common questions include, but are not limited to: (a) whether Defendants used JavaScript code to intercept and record Plaintiff's and the proposed Class's Website Communications with third-party websites while using TikTok's in-app browser; (b) whether Defendants violated the Federal Wire Tap Act; (c) whether the Website Communications at issue constitute "electronic communications" for purposes of the Federal Wire Tap Act; (d) whether Defendants derive a benefit or information from interception of Plaintiff's and the proposed Class's Website Communications; (e) whether TikTok's use of JavaScript code as described herein constitutes a "device" used to intercept or record private electronic communications; (f) whether Defendants acquired the contents of Plaintiff's and the proposed Class's private Website Communications without their consent; (g) whether Plaintiff and the proposed Class had a reasonable expectation of privacy in their Website Communications with third-party websites while using TikTok's in-app browser; and (h) whether Plaintiff and the proposed Class are entitled to actual, statutory, punitive, or other forms of damages, and other monetary relief.

CLASS ACTION COMPLAINT – No. 2:23-cv-00509

46. **Typicality:** Plaintiff's claims are typical of the other proposed Class members' claims because, among other things, all proposed Class members were comparably injured through the uniform prohibited conduct described above. For instance, Plaintiff and each member of the proposed Class had their Website Communications intercepted in violation of privacy federal law. This uniform injury and the legal theories that underpin recovery make the claims of Plaintiff and the members of the proposed Class typical of one another.

47. **Adequacy of Representation:** Plaintiff has and will continue to fairly and adequately represent and protect the interests of the proposed Class. Plaintiff has retained counsel competent and experienced in complex litigation and class actions, including litigations to remedy privacy violations. Plaintiff has no interest that is antagonistic to the interests of the proposed Class, and Defendant has no defenses unique to any Plaintiff. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the members of the proposed Class, and they have the resources to do so. Neither Plaintiff nor his counsel have any interest adverse to the interests of the other members of the proposed Class.

48. **Superiority:** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

49. **Predominance:** Common questions of law and fact predominate over any questions affecting only individual Class members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendants' liability and the fact of damages are

common to Plaintiff and each member of the proposed Class.  If Defendants intercepted Plaintiff's and the proposed Class's private Website Communications, then Plaintiff and each proposed Class member suffered damages by that conduct.

50.  **Ascertainability:** Members of the proposed Class are ascertainable. Class membership is defined using objective criteria and Class members may be readily identified through Defendants' books and records.

51.  **Substantial Benefits**:  This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable.  This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.  Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

52.  Plaintiff reserves the right to revise the foregoing class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

## CALIFORNIA LAW APPLIES TO THE ENTIRE CLASS

53.  California's substantive laws apply to every member of the Class, regardless of where in the United States the Class Member resides.  California's substantive laws may be constitutionally applied to the claims of Plaintiff and the Class under the Due Process Clause, Fourteenth Amendment §1, and the Full Faith and Credit Clause, Article IV §1 of the U.S. Constitution.  California has significant contact, or significant aggregation of contacts, to the claims asserted by Plaintiff and all Class Members, thereby creating state interests that ensure that the choice of California state law is not arbitrary or unfair.

54.  Defendants' U.S. headquarters and principal places of business are located in California.  Defendants also own property and conduct substantial business in California, and therefore California has an interest in regulating Defendants' conduct

under its laws.  Defendants' decision to reside in California and avail itself of California's laws, and to engage in the challenged conduct from and emanating out of California, renders the application of California law to the claims herein constitutionally permissible.

55.    California is also the state from which Defendants' alleged misconduct emanated.  This conduct similarly injured and affected Plaintiff and all other Class Members.

56.    The application of California laws to the Class is also appropriate under California's choice of law rules because California has significant contacts to the claims of Plaintiff and the proposed Class, and California has a greater interest in applying its laws here than any other interested state.

## FIRST CLAIM FOR RELIEF

### Violation of the Federal Wire Tap Act
### 18 U.S.C. §§2510, *et seq.*

57.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

58.    Plaintiff brings this claim individually and on behalf of the Class.

59.    The Federal Wire Tap Act provides a private right of action against those who intentionally intercept, attempt to intercept, or otherwise procure any person to intercept any wire, oral, or electronic communications.

60.    As described above, Defendants intercepted Plaintiff's and the proposed Class's Website Communications whenever they utilized TikTok's in-app browser to communicate with third-party websites using the JavaScript code inserted by TikTok, including every mouse movement, click, keystroke (*e.g.*, text being entered into an information field or text box), URL visited, and other electronic communication. These Website Communications – which comprise the transfer of signs, signals, writing, images, sounds, data, and/or intelligence transmitted in whole or in party by wire, radio, electromagnetic, photoelectric, or photo-optical system – constitute

"electronic communications" under the Federal Wire Tap Act and were copied by Defendants contemporaneously, in real time.

61.     Defendants sought to intercept Plaintiff's and the proposed Class's Website Communications with third-party websites in order to obtain the personal information and data about Plaintiff and the proposed Class contained in the contents of the Website Communications.

62.     Defendants purposely and consciously wanted to intercept these Website Communications as part of their business model designed to monetize the personal information and data obtained from these Website Communications. Defendants derive revenue from their ability to monetize such personal information to target advertising, which was accomplished using JavaSctipt code intentionally designed and engineered for that very purpose.   Interception of these Website Communications was in Defendants' self-interest.

63.     Defendants intercepted these Website Communications using a device or apparatus – *i.e.*, the JavaScript code inserted by TikTok whenever a user of the TikTok app interacted with a third-party website using TikTok's in-app browser – which was used to acquire the contents of users' Website Communications.  These interceptions were made contemporaneously by Defendants as the Website Communications were made.

64.     When communicating electronically with these third-party websites, Plaintiff and the proposed Class reasonably believes and expected these Website Communications to be private.

65.     Defendants intercepted Plaintiff's and the proposed Class's Website Communications at the time of transmission without the consent of Plaintiff, the proposed Class, or the third-party websites visited.

66.     As a result of the Federal Wire Tap Act violations described herein, Plaintiff and the proposed Class have been damaged and are entitled to: (1) appropriate equitable and/or declaratory relief; (2) damages in an amount to be determined at trial

(assessed as the greater of (a) the sum of actual damages suffered by Plaintiff and the proposed Class and any profits made by Defendants as a result of the violation, or (b) statutory damages of $100 per day per violation or $10,000, whichever is greater); and (3) reasonable attorneys' fees and costs.

## SECOND CLAIM FOR RELIEF

**Violation of California Consumer Privacy Act**
**Cal. Civ. Code §§1798.100,** *et seq.*

67. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

68. Plaintiff brings this claim individually and on behalf of the Class.

69. The California Consumer Privacy Act ("CCPA") protects consumers' personal information from collection and use by businesses without consumers' notice and consent.

70. Defendants violated the CCPA by intercepting Plaintiff's and the proposed Class's Website Communications with third-party websites in order to obtain the personal information and data about Plaintiff and the proposed Class contained in the contents of the Website Communications.

71. Defendants also violated the CCPA by failing to provide notice to their customers that Defendants intended to intercept these Website Communications using a device or apparatus – *i.e*., the JavaScript code inserted by TikTok whenever a user of the TikTok app interacted with a third-party website using TikTok's in-app browser – which was used to acquire the contents of users' Website Communications or of their right to opt-out of such interception to unauthorized third parties. Defendants did not give Plaintiff and the Class Members the opportunity to opt out before they intercepted their Website Communications to unauthorized third parties.

72. Plaintiff seeks injunctive relief in the form of an order enjoining Defendants from continuing to violate the CCPA, as well as actual damages on behalf of herself and the Class.

### THIRD CLAIM FOR RELIEF

**Violation of the California Unfair Competition Law**
**Cal. Bus. & Prof. Code §§17200,** *et seq.*
**(on Behalf of Plaintiff and the Class)**

73.   Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

74.   Plaintiff brings this claim individually and on behalf of the Class.

75.   TikTok engaged in business acts and practices deemed "unlawful" under the Unfair Competition Law (the "UCL"), because, as alleged above, TikTok unlawfully intercepted, Plaintiff's and Class Members' Website Communications in violation of the Federal Wire Tap Act and CCPA. In addition, TikTok's breach of its own privacy policy as alleged above constitutes a violation of California Business & Professions Code §22576.

76.   TikTok also engaged in business acts and practices deemed "unlawful" under the UCL because TikTok unlawfully intercepted and otherwise misused Plaintiff G.R.'s and Class Members' Website Communications without consent, which violates public policy as declared by specific statutory provisions, including California Family Code §§6701 and 6710, which prohibit Defendants from obtaining consent by minors.

77.   Specifically, California Family Code §6701(a) states that: "A minor cannot do any of the following: (a) Give a delegation of power." California Family §6710 states that: "Except as otherwise provided by statute, a contract of a minor may be disaffirmed by the minor before majority or within a reasonable time afterwards or, in case of the minor's death within that period, by the minor's heirs or personal representative."

78.   TikTok did not obtain the minor Plaintiff G.R.'s consent to intercept or use her biometric information. TikTok could not obtain consent to intercept or use the minor Plaintiff G.R.'s biometric information. To the extent that TikTok attempts to claim that it obtained the minor Plaintiff G.R.'s consent, pursuant to California Family Code §6710, Plaintiff G.R. disaffirms such consent.

79. TikTok also engaged in business acts or practices deemed "unfair" under the UCL because, as alleged above, TikTok failed to disclose during the Class Period that TikTok was intercepting Plaintiff's and Class Members' Website Communications without their consent. Unfair acts under the UCL have been interpreted using three different tests: (1) whether the public policy which is a predicate to a consumer unfair competition action under the unfair prong of the UCL is tethered to specific constitutional, statutory, or regulatory provisions; (2) whether the gravity of the harm to the consumer caused by the challenged business practice outweighs the utility of the defendant's conduct; and (3) whether the consumer injury is substantial, not outweighed by any countervailing benefits to consumers or competition, and is an injury that consumers themselves could not reasonably have avoided. Defendants' conduct is unfair under each of these tests. TikTok's conduct alleged is unfair under all of these tests.

80. As described above, TikTok's conduct violates the policies of the statutes referenced above. The gravity of the harm of TikTok's secret intercepting and other misuse of Plaintiff's and Class Members' Website Communications, including those by minors, is significant and there is no corresponding benefit to consumers of such conduct. Finally, because Plaintiff and Class Members were completely unaware of TikTok's secret recordings and disclosure, they could not have possibly avoided the harm.

81. Had Plaintiff known that her communications would be intercepted and misused, she would not have registered for TikTok. Plaintiff and Class Members have a property interest in any recordings of their biometric information. By surreptitiously intercepting or otherwise misusing Plaintiff's and Class Members' Website Communication, TikTok has taken property from Plaintiff and Class Members without providing just or any compensation.

82. Plaintiff, individually and on behalf of the Class, seeks: an injunction enjoining TikTok from engaging in the unlawful conduct alleged in this claim and

requiring TikTok to delete all intercepted Website Communications of Class Members, to cease further interception of Plaintiff's and Class Members' Website Communications, to implement functionality sufficient to prevent unauthorized collection in the future, and other appropriate equitable relief, including, but not limited to, improving its privacy disclosures and obtaining adequately informed consent.

## **REQUEST FOR RELIEF**

Plaintiff, individually and on behalf of the other members of the proposed Class, respectfully requests that the Court enter judgment in Plaintiff's and the Class's favor and against Defendants as follows:

A.      Certifying the Class and appointing Plaintiff as the Class representative;

B.      Appointing Plaintiff's counsel as class counsel;

C.      Declaring that Defendants' past conduct was unlawful, as alleged herein;

D.      Declaring Defendants' ongoing conduct is unlawful, as alleged herein;

E.      Enjoining Defendant from continuing the unlawful practices described herein, and awarding such injunctive and other equitable relief as the Court deems just and proper;

F.      Awarding Plaintiff and the Class members statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

G.      Awarding Plaintiff and the Class members pre-judgment and post-judgment interest;

H.      Awarding Plaintiff and the Class members reasonable attorneys' fees, costs, and expenses; and

I.      Granting such other relief as the Court deems just and proper.

1

## **<u>DEMAND FOR JURY TRIAL</u>**

2

Plaintiff, on behalf of herself and the Class, demands a trial by jury of any and

3

all issues in this action so triable of right.

4

DATE: January 23, 2023                           Respectfully submitted,

5

6
_s/_  _John T. Jasnoch_
John T. Jasnoch (Bar No. 281605)
Hal D. Cunningham (Bar. No. 243048)

7
**SCOTT+SCOTT**
**ATTORNEYS AT LAW LLP**

8
600 W. Broadway
Suite 3300

9
San Diego, CA 92101
Telephone: (619) 233-4565

10
Facsimile: (619) 233-0508
jjasnoch@scott-scott.com

11
hcunningham@scott-scott.com

12
***Attorneys for Plaintiff***

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT – No. 2:23-cv-00509